689 So.2d 308 (1997)
Leonard A. GLAZER, individually, etc., et al., Appellant,
v.
FLORIDA POWER & LIGHT COMPANY, Appellee.
No. 96-1715.
District Court of Appeal of Florida, Third District.
January 22, 1997.
Rehearing Denied March 19, 1997.
*309 Colodny, Fass & Talenfeld, Fort Lauderdale, and Howard M. Talenfeld and Maria Elena Abate; Marraffino & Roth, P.A., Boca Raton, and Lawrence J. Marraffino; Zisser, Robison, Brown, Nowlis & Wedner, Jacksonville, and Barry L. Zisser and Michael B. Wedner, for appellant.
Steel, Hector & Davis and Alvin B. Davis, Miami, Brian R. Brattebo, W. Palm Beach, Thomas R. Julin, and Edward M. Mullins, Miami, for appellee.
Before COPE, GERSTEN and GREEN, JJ.
PER CURIAM.
This is an appeal from adverse final summary judgments entered in favor of Florida Power & Light ("FPL") in this action for negligence and wrongful death. We affirm based upon our conclusion that the undisputed record below, taken in the light most favorable to appellant, demonstrates that FPL had no actionable duty to the appellants as a matter of law. Our holding obviates the need to reach the additional issue of whether the wrongful death action is barred by the passage of the two-year statute of limitations.

I
Appellant Leonard A. Glazer, and his late wife, Elsa, both contracted chronic myelogenous leukemia ("CML"), an extremely rare but terminal form of cancer. Elsa Glazer passed away in June 1988, just months after being diagnosed with CML. Leonard Glazer was not diagnosed with the ailment until January 29, 1992. During the relevant time frame, the couple resided at the same Coral Gables address and slept in the same bedroom for 20 years.[1] FPL owned and maintained electrical distribution lines and a transformer on the easement directly behind and immediately above the Glazer residence. These distribution lines were used by FPL for its delivery of electricity to the surrounding neighborhood.
Leonard Glazer instituted the action below against FPL on January 20, 1994 on behalf of himself and the estate of his late wife, Elsa.[2] The complaint initially alleged essentially that both Glazer and his deceased wife contracted CML as a result of their continuous exposure to magnetic fields[3] which emanated from FPL's transformer and distribution lines, and permeated their bedroom for twenty years. Specifically, Mr. Glazer alleged that FPL had a duty to warn consumers that magnetic fields, created by FPL's transmission of electricity, posed a cancer threat. According to Glazer, if he and his late wife had been warned, they could and would have taken corrective measures to reduce their cumulative exposure to magnetic fields, and thereby prevented their contraction of CML.
Approximately two years after this suit was filed, the Glazers' expert electrical engineer *310 subsequently discovered that the magnetic fields measured in the Glazers' bedroom were actually produced by grounded electrical current flowing in a water main and located behind the Glazers' bedroom. The Glazers amended their complaint to reflect this discovery.[4]
The thrust of the allegations in this second amended complaint was that FPL knew or should have known since the late 1970s that its electrical current travelled through the grounded neighborhood plumbing main as part of the neighborhood distribution circuit. It contended that as a manufacturer, distributor, and seller of electricity, FPL owed the following duties of care to the Glazers:
a) the duty to keep abreast of scientific knowledge, discoveries, and advances regarding the dangers or hazards of electricity and the duty to warn its customers of dangers and hazards associated with the use of electricity not commonly known to the general public including the duty to warn and to disclose the danger of exposure due to EMF created by current flowing through distribution and plumbing lines;
b) the duty to do all that human care, vigilance and foresight can reasonably do to protect those who use its electricity and live in immediate proximity to FPL facilities; and
c) the duty to maintain a level of prudent foresight and guard against foreseeable occurrences which can be reasonably anticipated.
The Glazers further alleged that FPL breached these duties by, among other things, failing to warn about the potential hazards of magnetic fields; failing to investigate the hazards of magnetic fields; failing to institute a home measurement program; actively misinforming the public regarding the possible dangers of magnetic fields; and misleading and influencing state regulators to avoid financial exposure.[5]

II
FPL moved for partial summary judgment on Elsa Glazer's wrongful death action based upon the passage of the two-year statute of limitations. FPL argued that the two-year time limit began to run at her death in 1988, even where the cause of death was not discovered until after two years had elapsed.[6] *311 See section 95.11(4)(d), Fla.Stat. (1987); Walker v. Beech Aircraft Corp., 320 So.2d 418, 420 (Fla. 3d DCA 1975), cert. dismissed, 338 So.2d 843 (Fla.1976). The trial court agreed and found that the two-year statute of limitations period was not tolled by Mr. Glazer's failure or inability to ascertain that his former wife's CML may have been caused by magnetic fields. Accordingly, partial summary judgment was granted on this action on October 17, 1995.
Thereafter, on April 30, 1996, FPL filed an additional motion for partial summary judgment on Mr. Glazer's negligence claim asserting that it had no liability since it was uncontradicted in the record that the dominant source of the magnetic fields at the Glazer's former residence was the ground current flowing on the public water main which was never owned, maintained or controlled by FPL and further that there was no research or study suggesting a link between magnetic fields from plumbing lines and cancer during the twenty-year period that the Glazers resided in their home.[7] At the hearing on this motion, the trial court concluded essentially that FPL had no legal duty to warn the Glazers about magnetic fields where there was no data or research suggesting a link between magnetic fields from grounded plumbing lines and cancer during the Glazers' twenty-year occupancy of their home. Partial summary judgment was granted on April 30, 1996.
On April 27, 1996, FPL moved for final summary judgment on the final claim, as narrowed by the earlier partial summary judgment, that FPL's own power lines and transformer located behind the Glazers' former residence had emitted dangerously high levels of magnetic fields which in turn, caused the Glazers' leukemia. At this hearing, FPL demonstrated with the opinion of Glazer's own expert that the level of magnetic fields emanating from FPL's own power lines located behind the Glazer residence was too minimal or negligible to have caused cancer or leukemia. This concession led to the following exchange between the court and Glazer's counsel:
[Court]: Mr. Talenfeld, everyone seems to agree that the level of radiation coming from Florida Power & Light's lines is harmless, is that correct?
[Mr. Talenfeld]: With respect to the distribution line itself, .2 milligrams would not have caused Leonard Glazer's leukemia. There is no question about that.
[Court]: Then are you saying that Florida Power & Light's duty to warn is a duty to warn of a harmless level of radiation?
[Mr. Talenfeld]: Well, that's interesting...
The court thereafter granted final summary judgment in favor of FPL on the basis that FPL owed no duty to warn about the remaining radiation from FPL's distribution lines which in itself was "harmless." This appeal followed.

III
As to his own negligence claim, Mr. Glazer argues on appeal that the trial court erred in determining as a matter of law that FPL owed no duty to warn generally about the risks associated with harmful levels of magnetic fields from FPL's electrical current running through the neighborhood electrical distribution circuits and plumbing lines. Specifically, Glazer asserts that FPL's failure to warn its customers about the dangers of magnetic fields; its affirmative misrepresentations to the public; its failure to research and investigate; its failure to take action in response to customer concerns; and its misrepresentation to state regulatory officials all created a foreseeable zone of risk for the Glazers and others and, but for FPL's breach of its generalized duties, the Glazers would not have been exposed to dangerous levels of magnetic fields from the plumbing lines and FPL's distribution line. FPL countered that it had no duty to prevent injuries allegedly caused by magnetic fields emanating from a public water main that it neither owned or controlled nor did it have a duty to warn *312 about possible adverse health effects from magnetic fields emanating from water lines where there was virtually no research or information available linking magnetic fields from underground water pipes to cancer during the twenty-year (i.e., 1969-1989) time span that the Glazers resided at their Coral Gables address.

IV
It is axiomatic that the existence of a duty is the threshold inquiry in any negligence action. Whether a duty exists is a question of law for the court's sole determination. McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla.1992). Foreseeability is the polestar in defining the scope of the general duty owed; a legal duty will be imposed whenever a human endeavor creates a generalized and foreseeable risk of harm to others. Id. at 503. Thus, the absence of a foreseeable zone of risk precludes the imposition of a duty on the part of the actor and accordingly, defeats a negligence claim.
Although electrical utility companies are not deemed insurers of human safety, our supreme court has imposed upon them a "greater-than-usual duty of care in proportion to the greater-than-usual zone of risk associated with the business enterprise they have undertaken." McCain, 593 So.2d at 504; see also Escambia County Elec. Light & Power Co. v. Sutherland, 61 Fla. 167, 55 So. 83, 91 (1911):
[An electric] company, while not an insurer against all possible accidents to those whose right or duty it is to use its electricity... is under obligation to do all that human care, vigilance, and foresight can reasonably do, consistent with the practical operation of its plant to protect those who use its electricity.
Accordingly, it has been concluded that "if there is any general and foreseeable risk of injury through the transmission of electricity, the courts are not free to relieve the power company of this duty." McCain, 593 So.2d at 504.
Based upon this standard, we must reject FPL's first argument to the extent that it suggests that FPL could have no actionable duty to the Glazers for injuries allegedly caused by dangerously high levels of magnetic fields produced from electrical systems grounded to a water main simply because the main is wholly owned and controlled by another utility. In our opinion, FPL's lack of ownership or control over the underground public water main would not be dispositive of its duty to warn if FPL in fact possessed superior and compelling knowledge of the dangers posed. Put another way, if the record evidence revealed that FPL had actual or constructive knowledge during the relevant time frame that its current was being grounded to metallic plumbing systems affixed to the public water main and thereby creating health risks, FPL could not sit silently and not warn its customers of this potential hazard. See White v. Orlando Utils. Comm'n, 156 So.2d 879 (Fla. 2d DCA 1963) (complaint alleging that power company released its electric current from its power line to residential home and thereby caused fire was insufficient to state cause of action for damages without allegation that company knew or should have known that circuits in home were defective) and cases cited therein. FPL's failure to warn under such circumstances would undoubtedly create a foreseeable zone of risk to others and most certainly would not be sanctioned as a matter of law. See McCain, 593 So.2d at 504.
As to its further argument, FPL does not dispute that it was generally aware of the fact that some household electrical systems were grounded and affixed to underground water plumbing systems. Nor does FPL dispute that it was generally aware of the fact that magnetic fields were being produced from such plumbing systems. What FPL asserts, however, is that there was no reliable information or research suggesting that there was a link between such magnetic fields produced and cancer during such a twenty-year period that the Glazers occupied their home. Based upon the dearth of such information, FPL therefore maintains that it could have no duty to warn or investigate further; therefore, its inaction in this regard created no foreseeable zone of risk to others. We agree.

*313 V
Although the record before us contains voluminous general information about both electric and magnetic fields, Glazer can cite to no scientific study or research undertaken during the twenty-year period that he occupied his home that specifically examined the issue of whether magnetic fields emanating from plumbing lines may be linked to cancer.[8] Instead, Glazer relies primarily upon a 1979 study by two epidemiologists, Drs. Wertheimer and Leeper, which found that among children in Denver, Colorado with leukemia, an unexpectedly high number resided near high-current power lines.[9] Nancy Wertheimer & Ed Leeper, Electrical Wiring Configurations and Childhood Cancer, 109 Am.J.Epidemiology 273 (1979). In this study, it was mentioned that electrical current also flowed via water pipes. Id. at 283. However, this study did not investigate or otherwise purport to make any findings as to whether such magnetic fields had any adverse health effects on humans.[10]Id. It should also be pointed out that Drs. Wertheimer and Leeper conducted an adult study in 1982 and found no statistically significant association between wire codes and adult leukemia. See Nancy Wertheimer & Ed Leeper, Adult Cancer Related to Electrical Wires Near the Home, 11 Int'l J. Epidemiology 345 (1982).
Thus, in the absence of any study or research to put FPL on notice of possible adverse health effects from magnetic fields emanating from water plumbing lines from 1969 through 1988, we conclude that no duty to warn or investigate can be imposed upon FPL as a matter of law and summary judgment was properly granted in its favor on this issue. We also conclude that summary judgment was also properly entered in FPL's favor as to Glazer's remaining issue that FPL had a duty to warn of the magnetic fields emanating from its power distribution lines where it was undisputed in the record that the level of such magnetic fields was negligible and had never been linked to any form of cancer. Accord Rice v. Florida Power & Light Co., 363 So.2d 834, 838 (Fla. 3d DCA 1978) (noting that a manufacturer of electricity is not required to maintain useless warning signs).
For these reasons, we therefore affirm the summary judgment.
Affirmed.
GERSTEN and GREEN, JJ., concur.
COPE, Judge (specially concurring).
I concur that the level of scientific knowledge did not in the past, and does not now, sufficiently establish the existence of a health risk so as to give rise to a duty to warn. I join the majority opinion except for part V.
As to part V, I respectfully disagree with the majority opinion's conclusion that the plaintiff's claim must be rejected because *314 there have been no studies of magnetic fields which emanate from water lines, as opposed to magnetic fields which emanate from electric lines. The distinction is not a relevant one.
The inquiry in the scientific studies is whether exposure to magnetic fields within the home poses a health risk. Beginning with the initial 1979 Wertheimer and Leeper study, it was explained that magnetic fields within the home can emanate from "a locally imbalanced current, both in the distribution wires and in the plumbing." Nancy Wertheimer & Ed Leeper, Electrical Wiring Configurations and Childhood Cancer, 109 Am.J.Epidemiology 273, 274 (1979); see also National Research Council, Possible Health Effects of Exposure to Residential Electric and Magnetic Fields 28 (1996) ("The three most common sources of residential 60-Hz magnetic fields are electric appliances, the grounding system of the residences (most often, water pipes), and nearby power lines (most commonly, low-voltage distribution lines))."
In investigating whether exposure to in-home magnetic fields poses a health risk, it is the overall magnetic field strength which is of primary concern. The pertinent question is whether a health risk has been shown to exist where there is a magnetic field, regardless of whether the source of the field is power wires, water lines, or both. There is no particularly good reason why, in assessing the existence of health risks posed by magnetic fields, the fields created by water lines would necessarily be considered apart from magnetic fields created by the distribution wires. I do not think that the absence of studies focusing exclusively on magnetic fields generated by water lines, as distinguished from magnetic fields generated by other sources, is dispositive of plaintiff's case.
The ultimate issue, however, is whether the level of scientific knowledge at the relevant time periods sufficiently established that magnetic fields posed a health risk so as to give rise to a duty on the part of Florida Power & Light Company to issue a warning to its customers. I agree with the ultimate conclusion that the level of scientific knowledge was not sufficient to give rise to a duty to warn.
NOTES
[1] The home was subsequently sold by Glazer in 1989.
[2] Glazer's current wife, appellant Doris Stiles-Glazer, filed a derivative claim for loss of consortium as well.
[3] Magnetic fields are one form of radiation which is created by the creation, transmission, and use of electricity. Technically, a "magnetic field" is one "component[] of the fields generated by moving charged particles" and is part of the "electromagnetic `spectrum.'" National Research Council, Possible Health Effects of Exposure to Residential Electric and Magnetic Fields 13 (Prepublication Copy 1996) [hereinafter NRC Report]. Other forms of radiation on the electromagnetic spectrum include ultraviolet light, X-rays, radio waves, microwaves, and visible light. Id. at 14. Some forms of electromagnetic radiation with high frequencies, such as X-rays, are known to directly damage biologic systems because they break down molecules into charged particles. The magnetic fields associated with the transmission of electric power, however, are considered "extremely low frequency." The precise way in which they interact with biologic systems, if at all, is not known. Id.; see generally San Diego Gas & Elec. Co. v. Superior Court, 13 Cal.4th 893, 55 Cal.Rptr.2d 724, 920 P.2d 669 (1996) (background discussion).
[4] For purposes of summary judgment and this appeal, it was undisputed that the grounded electrical current flowing in the water main was the primary source of magnetic fields at the Glazers' residence and that these magnetic fields existed as the result of neighbors grounding their electrical system to their metallic plumbing systems affixed to the public water main.
[5] Specifically, it is alleged:

31. Defendant FPL has breached the foregoing duties by:
a) failing to warn Plaintiff of the known potentially insidious effects of exposure to dangerous levels of EMF from current flowing through neighborhood distribution and plumbing lines;
b) withholding known scientific information from public dissemination regarding the danger or potential danger of [magnetic fields];
c) maintaining and utilizing a neighborhood and electrical distribution circuit which carries current in imminent proximity to the [Glazers' Coral Gables] home which created an unreasonable risk of harm to the Glazers' health and well-being due to the perilous levels of [magnetic fields] emitted therefrom as described above;
d) failing to monitor or provide a home measurement program which would permit its customers to monitor the dangerous levels of [magnetic fields] which were emitted from Defendant's electrical equipment and the Neighborhood Plumbing Main directly adjacent to the [Glazer] residence;
e) failing to use reasonable care and modify the neighborhood electrical distribution circuit or furnish some form of protection against the dangerous level of [magnetic fields] at the [Glazer] home;
f) taking a "wait and see" approach regarding the potential dangers of [magnetic fields] from distribution lines, plumbing lines and electrical facilities and equipment, thereby relegating Plaintiff and all others similarly situated to the role of "human guinea pigs";
g) failing to investigate and research the dangers of [magnetic fields] created by distribution and plumbing lines; and
h) misleading the public and government about the safety and potential dangers of [magnetic fields] created from distribution and plumbing lines and other electrical facilities and equipment.
[6] Mrs. Glazer passed away in June 1988, just months after being diagnosed with CML. On January 29, 1992, Mr. Glazer was also diagnosed with CML. According to Mr. Glazer's allegations, it was not until the spring of 1993 that he suspected that his late wife's illness and his own had been caused by magnetic fields.
[7] FPL sought summary judgment still further on the grounds that Glazer's negligence claim was barred by the doctrine of regulatory compliance. See San Diego Gas & Elec. Co. v. Superior Court, 13 Cal.4th 893, 55 Cal.Rptr.2d 724, 920 P.2d 669 (1996). The trial court did not address this issue below and we do not do so here.
[8] Indeed, one of Glazer's experts acknowledged that no study during the 1970's and 1980's ever investigated whether magnetic fields from water mains could pose a health risk. It was not until recent years that any studies have been made to examine whether magnetic fields from ground currents on water mains may be linked to cancer. According to one expert's deposition, Dr. Wertheimer prefaced a 1995 study with the comment that the health effects of ground currents had not yet been explored.
[9] Since these epidemiologists were unable to monitor the actual electromagnetic fields in the homes involved in their study or reconstruct the past exposure of a child who developed leukemia, they used a "wire-code rating" as a substitute for the electromagnetic fields. The "wire-code rating" was measured by considering both the distance between a home and a power line and the size of the nearby wires. The studies found that the higher a house's "wire-code rating," the greater the chance a child in that house contracted leukemia. Nancy Wertheimer & Ed Leeper, Electrical Wiring Configurations and Childhood Cancer, 109 Am.J.Epidemiology 273 (1979). Ironically, however, there is only a weak correlation between measured EMF levels and wire codes. E.g., NRC Report at 265-69. There is also only a weak correlation between measured EMF levels themselves and childhood cancer. Id. at 155; see also id. at 136 ("Whether the risk association is actually attributable to the magnetic-field exposure or some other factor is not clear.").
[10] In fact, the reference to water pipes came because the authors, discussing their results, speculated that electricity might be facilitating the absorption of toxic lead into the drinking water. Contrary to the appellant's contentions, they did not discuss the possible direct effects on humans of the resulting magnetic fields created along these water pipes. See id. at 284.